Howard-Canfield Company, a Corporation v. Commissioner.
Howard-Canfield Co. v. Commissioner
Docket No. 109635.
United States Tax Court
1944 Tax Ct. Memo LEXIS 300; 3 T.C.M. (CCH) 319; T.C.M. (RIA) 44111; April 5, 1944
*300 Julien Francis Goux, Esq., 201 San Marcos Bldg., Santa Barbara, Calif., and William A. McBride, C.P.A., for the petitioner. Byron M. Coon, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined a deficiency of $648.33 in income tax against the petitioner for 1938. The issues presented by the pleadings are the correctness of the respondent's action (1) in determining the depreciation allowance on petitioner's building known as the Howard-Canfield Building on the basis of a fair market value of $63,158.61 on March 1, 1913, and a remaining useful life, inclusive of post March 1, 1913 extensions, betterments and modernization, of 30 years from the beginning of 1938; (2) in including in the modernization cost of the building certain miscellaneous items totaling $11,235.55 and determining that their remaining useful life was 30 years from the beginning of 1938; (3) in determining that petitioner's building known as the Bakery Building had a remaining useful life of 30 years from the beginning of 1938; (4) in failing to eliminate $763.16 from the reserve for depreciation with respect to an extension made to the Howard-Canfield *301 Building in 1926; and (5) in failing to eliminate $2,170.38 from the reserve for depreciation on betterments made to the Howard-Canfield Building subsequent to March 1, 1913. Findings of Fact The petitioner is a California corporation, with its principal place of business in Santa Barbara. It filed its income tax return for 1938 with the Collector for the Sixth District of California. The petitioner's building, known as the Howard-Canfield Building, is situated on the southwest corner of the intersection of State and Canon Perdido Streets, in Santa Barbara, and was erected in 1904, at a cost of $70,620.63. The building, a semi-fireproof, two-story structure with full basement, is rectangular in shape, with a frontage of 127.2 feet on State Street and prior to 1926 had a frontage of 150 feet on Canon Perdido Street. It was built by a reputable contractor according to plans and specifications which were prepared by a prominent architect of Los Angeles and which required substantial foundation walls, structural parts and materials and good workmanship. The basement walls were of reinforced concrete, 21 inches thick. The partitions in the basement were of brick. All exterior walls *302 were of 12 inches of common brick and 4 inches of pressed brick veneer. The interior partitions above the basement were of wood and plaster. The roof was of the best grade of composition roofing. The first floor of the building was divided into three storerooms, with equal frontages on State Street. The second floor was divided into offices. State Street was, and has continued to be, the principal business street in Santa Barbara. Long prior to 1904 the business center of Santa Barbara was at Haley and State Streets, but it had gradually moved from there to Canon Perdido and State Streets, where it was in 1904. Across Canon Perdido Street from the Howard-Canfield Building and on the northwest corner of the intersection of that street and State Street was located the First National Trust & Savings Bank of Santa Barbara. The Edwards Bank was two doors from the southeast corner of the intersection and diagonally across State Street from the Howard-Canfield Building. Practically all the frontage on State Street for two blocks south of the Howard-Canfield Building and about 60 per cent for two blocks north was occupied by buildings of some character. At or about the time the Howard-Canfield *303 Building was erected other structures in the block in which it was situated included a small adobe building, in which was conducted a fruit and candy shop (back of which was a Chinese laundry), a livery stable and minor structures. In 1904 the population of Santa Barbara was about 6,800. Upon completion of the Howard-Canfield Building in March 1904, the corner storeroom which was immediately next to Canon Perdido Street was leased for a period of 10 years, at a monthly rental of $200, to C. H. Frinck, who conducted a men's furnishings business under the name of The Great Wardrobe. The middle storeroom was leased for 10 years, at a rental of $175 a month, to G. F. Trenwith, who conducted a business there under the name of Trenwith's Dry Goods Store. The other storeroom was leased for 10 years, at a rental of $175 a month, to John F. Diehl, who conducted a business there as Diehl Grocery Company. These tenants handled high class merchandise and had enviable reputations. Diehl Grocery Company remained as a tenant until 1934, and the space occupied by it is now occupied by Woolworth's. The other two tenants have continued to occupy the space originally leased by them. On March 1, 1913, *304 the frontage on State Street for two blocks south of the Howard-Canfield Building and about 88 per cent to 90 per cent for two blocks north was occupied by buildings. The same buildings at the intersection of State and Canon Perdido Streets that were there in 1904 were there in 1913, except that in 1913 there was a one-story semi-brick building on the northeast corner, in which was conducted a real estate and insurance business. In 1913 Canon Perdido Street was the principal street that crossed State Street, and, as in 1904, the business and commercial center of Santa Barbara was at the intersection of these streets, where it has continued to be. After 1904 many people came to Santa Barbara to live, and among them were numerous families of wealth. By 1913 Santa Barbara's population, including that of the nearby development of Montecito, was approximately 26,000. On March 1, 1913, the Howard-Canfield Building was in good condition and was among the best buildings in Santa Barbara. In 1914, when the first leases expired on the storerooms in the Howard-Canfield Building, new leases for a period of 10 years were entered into with the occupants, the monthly rentals under the new leases *305 being $350 for the corner storeroom and $300 for each of the other two. The following is a statement of the total rents received from the Howard-Canfield Building, city taxes, county taxes, other expenses, total expenses and net income for the years indicated: Rents
City
County
Other
Total
Net
Year
Received
Taxes
Taxes
Expenses
Expenses
Income
1904
$ 8,407.00
$ 556.00
$ 772.88
$ 1,614.67
$ 2,943.95
$ 5,463.05
1905
10,712.00
790.40
1,049.10
1,799.60
3,639.10
7,072.90
1906
10,599.25
832.32
1,071.60
2,548.42
4,452.34
6,146.91
1907
10,281.25
424.13
560.50
2,311.92
3,296.55
6,984.70
1908
11,222.91
1,223.47
1,917.50
2,208.47
5,449.44
5,773.47
1909
10,818.75
965.70
1,349.63
3,128.43
5,443.76
5,374.99
1910
10,375.45
952.75
1,340.25
2,015.02
4,308.02
6,067.43
1911
10,314.60
939.80
1,218.87
2,339.80
4,498.47
5,816.13
1912
10,615.00
1,114.73
1,215.28
2,088.19
4,418.20
6,196.80
1913
10,629.40
1,126.78
1,250.55
2,217.84
4,595.17
6,034.23
1914
12,472.35
1,549.15
1,342.87
3,288.29
6,180.31
6,292.04
1915
18,017.20
1,716.50
1,521.35
4,755.39
7,993.24
10,023.96
1916
16,154.50
1,298.68
1,575.35
3,109.18
5,983.21
10,171.29
1917
17,893.00
1,304.33
1,639.65
5,542.78
8,486.76
9,406.24
Total
$168,512.66
$14,895.14
$17,825.38
$38,968.00
$71,688.52
$96,824.14
*306 Prior to 1915 no additions or improvements were made to the Howard-Canfield Building. In 1915 a 50-foot, one-story extension to the rear of the storeroom occupied by the Diehl Grocery Company was made at a cost of $6,860.47. In 1923 a 50-foot, two-story extension to the rear of the storeroom occupied by Trenwith's Dry Goods Store was made at a cost of $22,187.04. In 1926, and subsequent to an earthquake hereinafter mentioned, a 50-foot, one-story extension to the storeroom occupied by The Great Wardrobe was made at a cost of $12,046.40. An earthquake occurred in Santa Barbara in 1925. No damage was done to the cement foundation of the Howard-Canfield Building. However, some of the piers on the front of the building had to be removed. The walls of the building at the roof line were badly damaged. In the interior the plaster was cracked. So extensive was this cracking that about one-third of the plaster on the second floor had to be replaced. In connection with the repairing of the building, the petitioner expended about $40,000, a portion of which was attributable to repairs and a portion to the structural strengthening of the building. During the summer of 1937 the petitioner completed *307 the modernization and strengthening of the Howard-Canfield Building, at a cost of $52,082.32. At the time of modernization the foundation was found to be in good condition and sufficiently substantial to support an additional story, if the construction of it had been desired. The roof also was in good condition. The lumber contained in the building was of long-lived Oregon pine, was sound, in place, and gave no evidence of further shrinkage or settling. Leaks into the basement of the building from the State Street side were remedied from the outside. Two circular columns in front of Trenwith's Dry Goods Store were replaced by structural steel trusses; brick cornering piers were replaced by reinforced concrete columns; the large plate glass windows in the side of the building on Canon Perdido Street and in front on State Street were replaced by smaller plate glass windows; door openings were reduced by the use of structural steel overhead; the walls of the building next to the roof line were replaced and in addition steel studs were inserted; and fire baffles were inserted in the attics to reduce fire hazards. The exterior brickwork was covered with one-inch Travertine marble, to *308 the top of the plate glass windows in the first story of the building. From there to the roof the brick veneer was stripped off, the bricks covered with galvanized metal laths, and three coats of cement waterproof plaster were put on. No substantial change was made in the original floor plans of the building. Certain of the bearing walls in the interior of the building, which were fractured, were replaced. The wooden stairway to the second floor was replaced by one of concrete and Travertine marble. Some of the partitions in the second story were changed and about two-thirds of the plaster on that floor was replaced. Travertine marble entrances were installed in all the stores. The electrical work was gone over and old-type items were replaced by modern ones. A new steel fire escape and a rear stairway were constructed to comply with the state law. No modernization was made of the plumbing. Included in the modernization cost of $52,082.32 were the following items, which were installed in the Howard-Canfield Building in 1937: Elevator
$ 4,165.72
Heating plant
3,057.00
Asphalt Tile flooring
2,712.07
Venetian blinds
714.61
Electrical fixtures
535.74
Directory board
39.59
Sand jars
10.82
Total
$11,235.55
*309 In addition to the expenditures heretofore set out as made with respect to the Howard-Canfield Building from 1913 through 1937, expenditures totaling $18,501.27 had been made to the end of 1937 for general improvements and betterments over the period. So far as disclosed, this amount included such portion of the $40,000 expended in 1926 as was allocable to the structural strengthening of the building done in connection with the repairs made as a result of the earthquake. Prior to 1937 the petitioner was allowed depreciation on the Howard-Canfield Building, computed on the basis of the building having had a cost or fair market value on March 1, 1913, of approximately $70,000, and a remaining useful life of 50 years from that date. In its income tax return for 1938, the petitioner took depreciation on the building on the basis of a cost or fair market value on March 1, 1913, of approximately $70,000, and a remaining useful life, including additions and betterments made prior to 1937, of 16 years from the beginning of 1938. Depreciation with respect to the modernization cost in 1937 was taken on the basis of a remaining useful life of 15 1/2 years from the beginning of 1938. In determining *310 the deficiency in controversy, the respondent allowed depreciation, computed on the basis of a fair market value on March 1, 1913, of $63,158.61, and a remaining useful life of 30 years from the beginning of 1938. The fair market value of Howard-Canfield Building as it existed on March 1, 1913, was $70,000. Taken as a whole, and including the seven items having a total cost of $11,235.55, as set out above, and comprising a part of the modernization cost of $52,082.32, in 1937, the remaining useful life of the building was 30 years from the beginning of 1938. In addition to the Howard-Canfield Building, the petitioner owned another separate structure known as the Bakery Building. This structure was erected in 1915, for use by Diehl Grocery Company as a bakery and in the manufacture of candy and ice cream. It was strictly a factory building, located across a 50-foot court from the Howard-Canfield Building, and had no store fronts. In 1934, after Diehl Grocery Company moved from the Howard-Canfield Building, the Bakery Building was converted into a stucco building, with fronts on Canon Perdido Street, for use as a retail store building. Opinion The petitioner contends that the Howard-Canfield *311 Building had a fair market value on March 1, 1913, in excess of $109,000, and that its remaining useful life, after modernization in 1937, was 25 years from the beginning of 1938. The respondent takes the position that his determination of a value of the building on March 1, 1913, of $63,158.61, and a remaining useful life of 30 years from the beginning of 1938, was correct and should be sustained. Both parties submitted evidence, including opinion testimony, as to the fair market value of the building on March 1, 1913, as well as to its remaining useful life from the beginning of 1938. Considering all of the evidence, including the character of construction of the building, its location, the use to which it was devoted, and the opinions of the witnesses, we have found as a fact that the fair market value of the building as it existed on March 1, 1913, was $70,000, and that its remaining useful life was 30 years from the beginning of 1938. In its petition, the petitioner alleges that the respondent erred by including in the cost of modernizing the Howard-Canfield Building in 1937, the amount of $11,235.55, representing the total cost of the elevator, heating plant, asphalt tile flooring, *312 venetian blinds, electrical fixtures, directory board and sand jars which were installed in the building at that time, and in determining that these items had a remaining useful life of 30 years from the beginning of 1938. It is alleged that these seven items had a remaining useful life of 15 years from the beginning of 1938. The allegations were denied by the respondent in his answer. The evidence shows that the petitioner included the foregoing items in the $52,082.32 entered in the modernization account which it set up on its books with respect to the modernization work that was done in 1937. In its income tax return for 1938, the petitioner did not segregate these items or the amount thereof from the remainder of the items of modernization and compute depreciation on them separately, but treated all the modernization items, including the abovementioned items, as a group or unit and computed depreciation thereon at a composite rate. So far as disclosed, the respondent did likewise in determining the deficiency. A composite rate for depreciation purposes is based upon an average life of all the items in the group. Where a composite rate is used, the taxpayer may not segregate *313 a portion of the group and be allowed depreciation thereon at a different rate from that based on the life of the entire group, by showing that the segregated items had a shorter life than the average life for the entire group. If the rule were otherwise, the petitioner would gain little here. No evidence tending to show a remaining useful life of less than 30 years was submitted with respect to any of the seven items, except the asphalt tile flooring and the heating plant. The evidence as to the remaining life of these items consists of the testimony of a witness for the petitioner, who was of the opinion that the remaining life of the flooring was about 15 years, and the testimony of a witness for the respondent, who was of the opinion that the remaining life of the flooring was not less than 30 years and that that of the heating plant was from 15 to 25 years. So far as disclosed, the composite rate used by the respondent for all of the modernization items as a group amply provided for any remaining life, shorter than the average for the group, that the flooring and the heating plant had. The respondent's determination is sustained as to this issue. In its petition, the petitioner *314 alleges that the remaining useful life of the Bakery Building from the beginning of 1938 was 22 years, and that the respondent erred in determining that such life was 30 years. No evidence directed to the remaining useful life of the building from the beginning of 1938 was submitted. Therefore, for lack of evidence, the respondent's action must be sustained as to this issue. Although the pleadings present issues relating to the respondent's determination of the reserves for depreciation with respect to the extension made to the Howard-Canfield Building in 1926 and for betterments made to the building subsequent to March 1, 1913, no evidence was submitted with respect to these issues, and no argument with respect thereto is made in petitioner's brief. Accordingly we assume that the petitioner has abandoned these issues and hold for the respondent as to them. Decision will be entered under Rule 50.